Good morning, your honors. May it please the court, Ian Pryor on behalf of Jonathan Talbot. On June 21st, 2023, Manoa Ainu, a North Face sponsored rock climber, decided to begin a campaign to destroy the reputation of Mr. Talbot, destroy his career, and effectively rearrange his life. And the basis for that was a short conversation the previous day in which Mr. Talbot, having recognized Mr. Ainu on the street as a North Face climber, somebody that had gained fame and notoriety for trying to diversify the climbing industry, approached Mr. Ainu, introduced himself, and engaged in a friendly conversation. He mentioned to Mr. Ainu that at his previous job, Mr. Talbot had served on the Diversity, Equity, and Inclusion Committee. At that point, things apparently went wrong, and Mr. Ainu became offended by that. So at three in the morning, while Mr. Talbot was asleep, Mr. Ainu started posting to his 15,000 Instagram followers. The thing that he posted right off the bat was a clear assertion of fact, that Mr. Talbot tried to fight me while saying racist things. That's an assertion of fact. Now, over the course... Can I back up? I want to parse that out, because there's two parts of that. He tried to assault me. Why would that be a statement of fact? Explain that to me. Because assault, does it have one meaning? Does it mean that you have to have physical confrontation? Could you assault verbally? How do we make that objective? It depends on the context, as with everything in this. But I think when you start looking at the statements he made throughout his Instagram post, he squared up. He got in my face. He invited me to fight. He is lucky to not have learned physically. What's clear is that, however you're framing the assault, this is a presentation of... This was near a physical confrontation, where a fight almost broke out. Well, if you look at the whole thing, it's ungrammatical and goes on and on and on. But there's nothing in it that really specifies that there's anything physical, that they just basically were yelling at one another and didn't like one another. I think it's ambiguous at best as to whether there's any accusation of physical violence or threatened physical violence. Well, Your Honor, I would submit that I think what a reasonable person would see when tried to fight me in that context, a reasonable person would assume that tried to engage in a fight, in something, whether it's pushing, shoving, threatening to fight. He started apologizing, buy me a beer. He squared up. He got in my face. That doesn't sound like fighting. It sounds like macho guys talking. Again, I would interpret squared up to squared up, put the fists up, squared his shoulders, prepared for a fight. It doesn't say that. It says he squared up. I got in my face. Right. And that's, I believe, a reasonable person would interpret that. Is there a trial on whether how far he was away from him and his body posture on when he was talking to him? I mean, is that what that turns on and whether that's defamation or not? No, I don't believe it does. I think the totality of the circumstances, when we say saying racist things while trying to fight me. That's a separate. I want to talk about. Sure. I mean, basically, he seems to be saying he kept trying to shake my hand. God forbid he should shake my hand. I mean, it doesn't sound like he's really trying to fight. If you read the whole thing through, it sounds like. Just it doesn't sound like a physical threat. And then I understand the questions are separating them. But, you know, I see I think we need to look at them somewhat together because they do kind of each. Why isn't calling someone a racist or a sexist or an anti-Semite? Why isn't that an opinion? Well, that depends. Right. And the and as your honors know, whether it's the Ninth Circuit, we've seen we cited cases from the Second Circuit. The general analysis comes down to, I think, three questions. First, is it an assertion of fact? And there's a difference. And there's two buckets here where we have he said racist things versus he is a racist. Two buck. Sure, because I agree with you. Well, I'm not sure I agree with you. I think you're saying he's a racist is not defamatory. I'm not saying that. I'm saying it depends. I think the next level of analysis, he's a racist is not defamatory, but that's different than saying he said racist things potentially. But how do we distinguish that if if me calling you a racist is not defamatory because it's a matter of opinion, doesn't that also apply to the statements? I mean, I agree with you that there's a difference there because saying that you said racist statements is it's a it's a it's a it's a different bucket. But I'm not sure how we could say, assuming we agree that. Calling you a racist is not defamatory. How does it become defamatory if I describe the statements he made that way? He didn't say the statements that were made. Well, he kind of did make the statements. Well, so I'll take the first the first piece of that first, which is how, you know, is there some level of opinion in someone saying something said racist? Right. Well, sure. And there's also some level of opinion in saying that somebody sexually harassed me. It does depend on the perspective. But those are things that are tried in court every day, whether it's a racial harassment claim or sexual. All this other stuff matters, because basically what he's talking about in detail is is an uncomfortable conversation where the person is trying to apologize. Shake my hand. He's bugging me. Leave me alone. It's not really about, to use your example, sexual harassment, saying, you know, this person walked up behind me and grabbed my rear end. I mean, that's what I call sexual harassment. That's a factual statement. But here, the factual surround is basically he tried to shake my hand. He was up in my face. He was saying really stupid things. And it just I don't see I'm having trouble seeing what the factual assertion is that is allegedly false. Well, I'd point the court. I know it's not precedent, but to the Second Circuit case in law, I'm asking about this. What is in these posts that, in your view, is factual and specifically factual and false? He said racist things. When someone says they said racist things, a reasonable person is going to think that's a racial slur or something to that effect. That's not what it said. I mean, that goes back to my question about if if me calling you a racist can't be defamatory because it's not objectively proven to be true or false, how can making a racial or a racist statement be proven objectively true or false? Well, if I may, Your Honor, I would disagree with that first premise. I think that from the case law, for example, the case where somebody was called an anti-Semite, it was a judge that was called an anti-Semite out of the Ninth Circuit. I have the Sagman case. The court said, well, look, that was Yagmin, I thought. Yagmin, sorry, Yagmin. This is something where they disclose the facts behind the opinion, which is, well, he's frequently sanctioned Jewish attorneys more than the non-Jewish attorneys. So being called anti-Semitic is a fully developed opinion, however you think of it, based on the facts that were disclosed. Whereas if you have something that could be an opinion that does not have the facts disclosed, well, then we get into mixed opinion territory. But is John Jones a liar or from the restatement and Milkovich or, you know, walking down the street and saying, you know, I walk down the street, I see my neighbor, he's an alcoholic. That's different. And that that could be defamatory versus I walk down the street and see my neighbor, you know, in six months he's drank two beers. I can determine that that opinion is probably invalid, but it's not defamatory because you've disclosed the facts behind the opinion. Well, that's the problem I have here too, because he discloses in great detail what happened, which is, this is a long conversation. He's trying to stop the conversation. He says, you're not listening to me. I apologize. And then he says, well, why are you apologizing if you think he didn't do something wrong? I mean, he gives all the facts. And that's why I was asking you what, which of those facts do you think demonstrates that there's a factual basis that makes this defamatory as opposed to opinion? Those, those facts, the, you know, discussing what happened in the bar is after the confrontation. So there's the whatever, not confrontation, the introduction on the street, there's that introduction. And then there's what happened after. Mr. Ainu spends a lot of time talking about what happened after, but when he's talking about what happened on the street, he does not say what it was that Mr. Talbot said. Well, which I thought he did. I thought he did. And he said, I mean, look, I don't, reading this, I don't come to the conclusion that he's a racist. I'll just be honest with you. And in fact, I think his company, Talbot's company said there was no identification of any racist statement that was made. Do I have that? Do I have those facts correct? I believe a few days later after they talked to Ainu, correct. So, but, but Ainu does give some color to this and says, well, I told him I was in diversity. And then apparently in the way he was, apparently the way that Talbot was asking the questions, Ainu took offense to that. Why doesn't that provide the context for someone to look and say, problem's not Talbot, problem's Ainu. He's just way oversensitive. I think the statement that he was asking me questions about diversity is still overbroad. It's like saying he was talking to me about race. Well, what about race? What is it in that generalized discussion that formed your opinion? And I would also add that, sure, somebody could maybe look at this and think one thing, but outdoor research, Mr. Talbot's company released a statement the next day based on Mr. Ainu's posts on the 21st. And they didn't talk about, you know, we learned about Mr. Ainu's opinion of Mr. Talbot and we're going to take action. No, we learned that there was a confrontation between an OR employee and Mr. Talbot and discriminatory conduct will not be tolerated. They interpreted it as discriminatory conduct. That's certainly evidence that a reasonable person could- Well, they may have been doing that just to be extra careful whether they thought it was discriminatory or not, because it was perceived that way. They wanted to make sure that everybody understood that that's not their viewpoint. I'm not sure that, I don't understand why you think that demonstrates that they actually thought that what he did was wrong. It's what a reasonable person could conclude from the statements. And we also cited some of- I mean, I guess you're just using that or what the statements could be interpreted as. Yeah, no, look, it's complicated. There's a lot of interplay here. Why was he actually, so he wasn't terminated. Talbot was not terminated until a few days later or even weeks later. He was put on administrative leave and then he was terminated. And I know it's hard to read into this because companies never say the truth, but they say he was terminated because he showed poor judgment before and after the BART incident. What do we take from that? I mean, because the real problem here seems to be that Talbot was terminated. I mean, if he hadn't have been terminated, I'm wondering whether we'd be here. If research had kept him on and just give him a warning and said, hey, be careful about what you're saying. And so I'm sensitive to Talbot's position on this, but I'm wondering what we're supposed to take from that, because was there more to it? Is there anything in the record about why he was actually terminated? No. I mean, I believe that when they talked about before and whether it was before and in the BAR or before and after the BAR, the before the BAR is the introduction on the street that happens after the focus group that he's there for. And then the in the BAR is the back and forth in the BAR. I think if you look at the context of that, along with the public pressure that Mr. Iman was bearing on outdoor research, along with outdoor research's initial statement, it's clear for whatever reason that that is why they terminated him. Whether they believed it or not. To me, when I read all this, to me, the poor judgment is continuing to have a conversation with this person who obviously didn't want to have a conversation with him. I mean, if he had walked away after the initially the person said, you know, our conversation is over, bro, or something like that. I don't remember the identical words. He could have gone to another bar and walked away and none of this would have happened. And so to me, that's what poor judgment is about, not your interpretation at all. Well, I just don't think that's a reasonable interpretation. That's what INU stated in his post, in his Instagram post. That's not necessarily what the record supports. Mr. Talbot thought, what's going on? He could have walked away when it was clear from about minute two, if you read this post, that this person was hostile to him in some way, for some reason. It doesn't even matter why. So I guess I don't find your interpretation of what the poor judgment was to be reasonable. Well, I think if you look at the context of the conversation, if you look at, you know, Mr. Talbot approached Mr. INU and talked to him because they had it. He had an interest in what Mr. INU was doing. And clearly he said, I want to understand what I did wrong. Hostile and was clearly not wanting to have a conversation. He could leave. It's like road rage, you know, when somebody is like that, you just keep driving, right? I mean, that's, that's what he, that, so when I look at this situation, that's what I see is the pretty much the only reasonable interpretation of what the poor judgment was. Well, I think that would become an issue of fact at that point. What actually was, I mean, we have one statement from outdoor research as to why, but what is the reason? What is the true reason behind why? We don't know that. That's what discovery is for. So all we have is before the bar and during the bar. Counsel, if I could ask you to address the Sandman case from the sixth circuit, I'm assuming they're going to bring it up. I want to hear from you. Sure. You know, I think the Sandman case is distinguishable. And if I may take two minutes for rebuttal, I think the Sandman case is distinguishable because number one, it happened in a very public place. There were witnesses, there were photographs taken by the media. There were videos online. The Sandman case went to great lengths to explain that, look, all of the stories that cover this either describe the incident fully or linked to video of the incident. So it's one of those situations like Milkovich talks about where, you know, if the facts supporting the opinion are either fully disclosed or fully known, then it's pure opinion. However, if those facts aren't fully disclosed or aren't fully known, then it becomes mixed opinion and is actionable. With that, I will reserve the balance. I'll give you three minutes. Thank you. All right. So for next year, just so we're clear here, we've got two counsel splitting time. I'm taking eight. He's taking five. On the cross appeal for the slap. Okay. So just so we're clear, I'm going to take a minute. So you're taking eight and you're taking five and you want to reserve seven. Okay. So when I preside, I should have said this before. So who's going to go first? Ms. Walker. So Ms. Walker, I'm going to give you a hard eight. What I mean by that is so you don't have to sweat over here. I'm cutting you off at eight. If you're done before eight, then you get more time. But I don't want you to be in a position where all of a sudden she goes 13 and you got 30 seconds. Okay. So with that, I understand we're going to go hard eight and you may proceed. Good morning. There are two reasons that this case failed. Could you state your appearance please? Yes. Lita Walker on behalf of the North Face with Ballard Spar. And there are two reasons the case fails against my client. The first is that it did not publish Mr. Anu'u's speech and it is not liable under any doctrine. And second, and what you've just spent the bulk of my opposing counsel's time discussing, is that the speech itself was not actionable. It is opinion and that requires dismissal as to both defendants. It's a little bit odd, isn't it, that we're having you speak first because your claims, I mean, if the underlying one is not defamatory, then you couldn't have vicarious liability for it. You're sort of putting the cart before the horse because you're saying, I mean, let's assume they were defamatory statements. I'm not aware of defamation ever being, there's vicarious liability for defamation. Me neither. Yeah. So I'm not sure you need eight minutes to make your case, to be honest with you. I don't have to address vicarious liability if you don't want to. Well, I think I would address the merits first because if you went on the merits, the next issue doesn't really matter. I'm happy to do that, Your Honor. And I wanted to maybe pick up on that where you began questioning my opposing counsel. So you made a distinction or someone asked, is there a difference between he's a racist or he said racist things? And the answer to that is no. And my opposing counsel is confusing the doctrine of pure opinion and the doctrine of mixed opinion, in which case facts must be disclosed. Pure opinion, I love Bruce Springsteen. I hate the color purple. Mushrooms are gross. You don't need any facts. And multiple courts have held that he's a racist is a pure opinion. He made racist statements is different. No, I disagree, Your Honor. He said racist things is not different. That is also a subjective judgment of what is racist. Now, if he said, if Mr. Inouye had gotten online and said, Mr. Talbot called me the N-word, that's a fact. In the La Liberté case, the allegation was or the suggestion implication was the plaintiff have said he's a dirty Mexican. That's provable. They said it or they didn't. Here's the problem that I have with this case. Mr. Inouye clearly had a vendetta to get him fired. He wasn't going to stop. And he said, I mean, he did say he assaulted me last month. That one seems more provable. Can I answer that? Yeah. So to me, first of all, the assault statement was never alleged to be false and defamatory. If you look at paragraph 84 of the complaint, there is a very detailed listing of 11 statements that they allege are false and defamatory. The assault statement is not among them. Also not among them, your honors, is the statement that... Okay. So let me address that because I was looking for that. I thought I came to the conclusion that it was encompassed within there. But I had that question. Let me ask you that. If that's true, then why was this dismissed with prejudice and not... Because I mean, basically now the response to that may be, well, he didn't never ask for an opportunity to amend the complaint. That is true. I mean, there was a notice to him that we would be bringing an anti-slap motion. So he had a chance to amend or withdraw at that point. We had a motion to dismiss. He could have filed an amended complaint. He's had multiple opportunities. We've raised this issue multiple times. He also did not allege as false and defamatory the statement that Mr. Talbot squared up. And he did not allege as false and defamatory that Mr. Talbot got in Mr. Anu'u's face. If you look at the bullet points in paragraph 84, what he says is that he tried to fight me, initiated a fight. But why? I mean, that seems to encompass that. I think maybe that's what I latched onto to say, I think this is within the realm. Yes. And I don't want to hang our hat on the waiver argument, even though I think it's waived. My point to you would be that all of those statements are essentially alleging that Mr. Talbot was acting in a physically menacing manner toward me. And that is opinion. I mean, assault has a subjective element of the victim's state of mind to begin with. He must have a reasonable apprehension of bodily harm. Can assault never be actionable? To say he assaulted, to say he hit me, that's actionable. Exactly. But to say he assaulted me, can that never be actionable? I don't think you have to decide that. And I think what you look at here is the content and context in which he made it. And as Judge Graber has pointed out, ungrammatical, late night postings after a bar, clearly agitated, filled with emojis and profanities. No one thought that was a statement of fact. Well, back up. Somebody did. I mean, the company did. The company was concerned enough about it that people would think that that was statement of fact that they fired him. That's why we're here today, because he got fired. And this is a problem. I mean, I don't want to bring social background into this, but this is the problem that's going on, is disagreements can't just be disagreements anymore. And Mr. Ainu pushed this until Talbot lost his job. And that's the problem. Why doesn't that bring it? Does that bring this into, I know this wasn't really argued in the I mean, the law recognizes that it's more, you know, there's a stronger responsibility for the statements that you made. Well, I think you are bemoaning counter or cancel culture. I am. And we can all bemoan that. That is not a commentary on the merits of the case, except that it makes me question whether we're addressing this correctly. Maybe, I mean, and it's not just Mr. Ainu. I mean, we can name 10 examples going up to the highest levels of the country where we've got to fix this problem. I think on the, I don't disagree that it's a problem that needs to be fixed, but that doesn't speak to whether this was opinion where you look at the content and content. I'm wondering if it does. I'm wondering whether our law has been too deferential and maybe there's nothing we can do because we're bound by it. But I'm wondering if our law has been too deferential to these opinion statements and allowed First Amendment protections to engender and contribute to an uncivil environment. So to get back to your question of whether assault can ever be actionable, it can be. And I would point you to the Telnet case where someone actually made a report to the police, highly factual, deliberate, sober. What I would also point you to- I'm not hoping we'll back up. To me, that's almost, I think that goes against you here, because this was tantamount to a report to the police. It was worse than that. It was taking this guy's profession and putting it on the chopping block and making statements until he got what he wanted. So if you're talking about the deliberateness of the statements being made in a police report, I would say this is tantamount to that. But Mr. Inouye's motives, even if you want to call what he did malicious, is in no way a factor in any of the issues before you. I don't think that's accurate. The other thing I would point out about the assault statement is one you touched on, right, which is that he didn't say he pulled a gun, he threw a chair, he took a swing. Just like saying he's a member of the KKK or he called me the N-word. Those are all factual. But he's a racist. He said racist things. I felt physically threatened by him, which is what all these statements boil down to. Those are not statements of fact. I have a question. Oh, go ahead. Let me ask. We'll go here or we'll go here. Yeah. Did North Face, is Mr. Inouye still working for North Face? That's not technically in the record, Your Honor. Um, well, I'm just wondering if there shouldn't be tit for tat. And Mr. Talbot was fired for questionable judgment. I'm not sure. Mr. Inouye might need to be taken action against for questionable judgment. I'm not sure that's really before us today, but. I'm going to use a little bit of your rebuttal time because you mentioned the anti-SLAPP issue, which you have not touched on. That, um, we have a case that is going to be heard en banc concerning the question whether an anti-SLAPP motion under state law can be brought in federal court, Gopher Media. Is there any reason in your view why we should not wait for that case to decide this question? You do not need to wait. The Gopher Media case involves a different state's anti-SLAPP statute, and it involves interlocutory appeal. The Washington anti-SLAPP statute follows the same standard for a dismissal as Federal Rule 12, and the Ninth Circuit has consistently held that those statutes can apply in federal court. Yes, but en banc, it doesn't have to stay with it. That's my point exactly. The court could decide that those cannot be heard in federal court, period. So that's my concern about deciding. I see. Yeah, I mean, we listened to that argument. That question didn't come up, and that was an interlocutory appeal, which this isn't. But if you think there is a chance that the Ninth Circuit reverses a number of years of precedent holding that it can be applied in federal court, then on that isolated issue in this case, perhaps you would want to wait. Very well. So what we'll do is, for rebuttal, we'll give her six. Thank you. Good morning. Henry Tessar on behalf of Minoa INU. There's no question that there was a heated encounter in Bozeman, Montana, between Talbot and INU. This case concerns whether INU's telling of that encounter and his opinions about that encounter on Instagram are actionable as defamation. They are not. These are subjective assessments or observations about another's conduct. Counsel, there's a curiosity, and maybe both you and opposing counsel can respond to this. As I understand their tortious interference claim, it rests entirely on the defamation claim. That is the basis for the allegation of tortious interference. Tortious interference can be a lot broader than that, but it just isn't pleaded here. If I go out and pick someone out of the audience here in the court, and I tell their boss to fire them, that could easily be tortious interference having nothing to do with defamation or a heated argument or whatever. You know, I don't like your cousin. So I guess I'm more concerned with the tortious interference claim than the defamation claim per se. Is there any other hook in this complaint that you are aware of? I am not and tell it conceded at the district court level that if the court dismissed the defamation claim, that the tortious interference claim should also be dismissed. I believe that was made in briefing and in front of Judge Morris in the district court. Well, that's how I saw it too, but I thought that was unusual. So going back to you that this was these statements, the challenge statements of he tried to fight me and he made racist comments. Those are subjective assessments about another's conduct. Judge Nelson, you're completely correct that you, as the reader of Mr. Inouye's statements, you're allowed to disagree with his opinion. The Herring Network case that I believe Judge Owens was on the panel for was a case where Rachel Maddow said that a news network was literally paid Russian propaganda. She stated the facts that she was relying on similar to here where, you know, Manoa said he started asking me questions about DEI. He didn't want to hear my answers. He just kept cutting me off. And by the way, this is, you know, as opposing counsel admitted, Mr. Talbot approached a random black North Face climber on the street and started asking him about diversity. And then he wouldn't listen to him. Well, hold on. I'm not sure that's entirely fair. I mean, he started to ask him about, as I understand it, the conversation started with their joint interest in climbing. And then Mr. Inouye brought up I'm in DEI and that prompted the follow up questions. That is not what is in the record. If you look at Manoa's first Instagram post, and I believe the complaint, what the allegations are and what was represented by opposing counsel, Talbot recognized Manoa because he's a public, you know, he knows him as a climber and bozeman. This was not that Manoa and Mr. Talbot struck up a conversation about their mutual like of climbing. Mr. Talbot approached Manoa. That's what is in the record. Because he recognized him, apparently. As a climber, not, well, OK. Well, as a black climber. And the first thing that he does, according to Manoa, is start asking him about diversity. And then he won't listen to him when he's responding. So those are the facts. Manoa can decide if he believes that's racist because those facts are stated. The audience can decide whether they agree with the opinion. A, as the Herring case says, an audience is not going to look at a statement where the facts are disclosed and insinuate that there are other underlying facts. They can take the facts, look at the opinion and decide whether they agree. On the question of, you know, whether a racist statement can be, saying somebody made a racist statement can be true or false or as different than calling them a racist. I would direct the court to Stevens v. Tillman. This is a Seventh Circuit case from 1988. And it essentially says that, quote, racist, end quote, is an imprecise, value-laden word that could be used to mean, quote, he is condescending to me, which must be because of my race, because there is no other reason to condescend. You know, this is a value-laden word based on a perception of Manoa's. Talbot could disagree. You can disagree. But it is an opinion and it is not provably true or false, which is the cornerstone of defamation law. If I could just quickly address the public concern issue on the anti-SLAPP statute. Talbot has made a point to try to wrangle the North Face into this case by saying that I knew in the North Face are social justice warriors. He has alleged that Manoa uses his platform, his Instagram account, to make comments about what he believes is racism and for social justice. I don't think that they can now go and hide and say, well, this speech wasn't on a matter of public concern. If you look at the articles attached to the complaint to make this same point that the North Face and I knew are, you know, these social justice warriors in cahoots. CNN, People magazine have published articles about Manoa or, you know, his climbing and they ask him questions where he says, I go climbing and people don't look at the equipment. They look that I'm a black climber. They don't see me as a climber. And I want to change that. This is a microcosm of what he has been experiencing his whole life as a climber. And to say that he cannot speak out about it because it was not asked by CNN or People magazine, I think does disservice to what the public concern is and what Washington law says. Of course, that's only but for that question, we may need to wait until we decide go for media on a mock, right? I have not paid attention to that. So I would defer to the council. Thank you. I want to speak briefly on this, this public concern issue, because the question is, well, should we wait until on bonk? I don't know that that's even necessary, because I think when you look at Restatement Section 150, all the factors really do add up to applying Montana law. The one area where we agree is Restatement 150 does apply here. Now, it says that the plaintiff's domicile is usually the place where you choose the law where also the act of the defamatory communication occurs. Well, the act occurred in Montana. Also, if the act occurred in a different state than the plaintiff's domicile, but the plaintiff is only known as domicile state, and that's where all the damage occurred, well, then the plaintiff's domicile is the choice of law state. However, in this situation, it's neither of those. So you go down to the factors. And what do we look at? Well, the defendant's domicile is in Montana. Yes, the plaintiff's domicile is in Washington. Where is the plaintiff better known? Montana. He had only moved to Washington six weeks earlier. Where did the act of the communication occur? That occurred in Montana as well. Where was the communication consumed? Well, we don't really know where it was consumed or not because it's online. We don't know if it was Washington or Montana or Illinois. We don't know where his followers are based. And then finally, I don't know if I mentioned INOO's domicile is in Montana. So with the exception of special damages, on that one, yes, you could say Washington is the area where special damages were the most impactful because that's where his job was. But the rest of the factors all point to Montana. So I would suggest that we don't even need to get to the anti-SLAPP if, in fact, they were correct on the underlying issue because Montana law applies, not Washington law. And with that, I had just one actual question. I was curious if Talbot has brought in action against outdoor research for the termination. We did not. We certainly looked at that, but ultimately we were not able to. Well, thank you very much. If there's any more questions. Thank you, counsel. Thank you. I want to get to the two issues I didn't have time to when I stood up the first time. The first is why the North Face is not liable for speech by Mr. INOO. In any defamation case, the defendant must be a publisher. That's a term of art. And as to the statements at issue here, the North Face was not a publisher. Mr. INOO was. And it's conceded that he's an independent contractor for the North Face. And as such, his role is very limited. The statements he posted here on his own profile, on Instagram, without mentioning the North Face were entirely his own. The North Face didn't direct or doesn't direct or control the day-to-day speech of its sponsored athletes. And these statements were posted without its review, knowledge, oversight or permission. Perhaps recognizing this, Mr. Talbot has relied on vicarious liability and a vague theory of agency. And Judge Nelson, you mentioned you're not aware of any vicarious liability case involving defamation, and neither are we. But even if you want to entertain the possibility that an independent agent, an independent contractor can be an agent for purposes of a defamation case, Mr. Talbot just hasn't pleaded facts to support that theory. And the key case here is the Lokova case, both at the District Court and at the Fourth Circuit. The District Court correctly relied on that case in holding that it's just not even plausible under Twombly that the North Face, a major corporation and a name brand retailer, would authorize the speech at issue here or even benefit from it. The only connection that I saw in the posts was the Instagram bio. I do not do social media, so I may be getting this wrong. But it looked like that had at the North Face in his description of himself. But I didn't see anything else. What is the import of that, if any? So nothing. The Lokova case addresses a similar fact involving a contributor to MSNBC. The way Instagram works is you have a profile where you can say lawyer, mother, Fisherwoman. And Mr. Anu's bio mentions the North Face because he's one of their sponsored athletes. But the posts at issue here, and many, many, many of his posts on a day-to-day basis don't have anything to do with the North Face or apparel at all. None of the posts here mentioned the North Face. And in fact, he sometimes tags competitors of the North Face, such as Patagonia. So I hope that answers your question. And I want to move to the anti-SLAPP law. We'll rely on the choice of law issue. We'll point you to our briefs. But the only issue on which the district court faltered is whether Washington's anti-SLAPP law applies. And the only question here is whether the speech was on a matter of public concern as defined by that statute. And I would point you to the JAH case, J-A-H, which interpreted Washington's anti-SLAPP statute and found that the definition of public concern must be broadly construed. You can also look at the Connick case out of the U.S. Supreme Court and the Binkley case, which said even the slightest tinge of public concern counts. Ainu'u's statements really clear that low bar. And more than that, if you look at the allegations against the North Face and the theory of vicarious liability that brought it into the case, which is a national social justice mission, that's an even easier decision. But if we start with Ainu'u, a couple of points. Labeling something as opinion, classifying it as opinion, doesn't take it out from the umbrella of what is a matter of public concern. And by the same token, using a personal story for illustrative purposes does not transform an issue of public concern into a personal gripe. The personal is political. And personal anecdotes, like Mr. Ainu'u shared, are essential to understand nuanced, hard-to-grasp issues. When he stood up the first time, my opposing counsel made the point that Mr. Ainu'u had gained fame and notoriety for trying to diversify the outdoor industry. He's a black man competing in a mostly white athletic endeavor, living in a mostly white part of our country. And this is a cause that's important to him. And that night after the Crystal Bar interaction was not the first time he's spoken about it. When he did speak about it on Instagram, he was trying to illustrate this issue of subtle rather than overt racism and corporate apathy toward it. Those are interests of public concern. Those are being written about. We know about how Budweiser and other brands have faced backlash for corporate wokeness or corporate non-wokeness. And you can have all kinds of opinions about whether corporations should engage in this sort of culture war. But it is a matter of public concern. And not only that, but Mr. Ainu'u didn't target some random guy. He targeted a man who works in the outdoor sports industry. And he actually targeted the employer. He called out outdoor research multiple times. And he said in these posts, my work is to change the outdoor industry. Finally, your honor, as to the North Face, it clearly clears the bar. I'm out of time. Can I finish my sentence? Because the only reason it's in this case is because of this national social justice mission that it has. And even if that does not suffice for vicarious liability, it does get the North Face under the public concern requirement of the Washington anti-SLAPP statute. Thank you. All right. Before we adjourn, Mr. Pryor, because she brought up an argument in rebuttal that she did not bring up an earlier. I wanted to give you an opportunity, if you wanted to address the vicarious liability issue, I'll give you a couple minutes to do that. Sure, I'll just briefly address that. We did cite Montana law discussing vicarious liability. With respect to the publication, we're not saying that they're vicariously liable because Mr. Burleson published or republished what AINU said. It's merely a brick in the evidence of what we think gets passed a motion to dismiss is North Face encouraging this kind of action against competitors to create newsworthy stories, allowing its sponsored athletes to engage in that. And then Mr. AINU engages in that and his boss approves of that. Not that the publication itself triggers vicarious liability. Is it true that you said that your vicarious liability, or excuse me, your tortious interference claim rises or falls with the defamation claim? We believe it does under Montana. I mean, we did stipulate it because it needs a wrongful act. Unless there's another wrongful act that is on the face of- Why wouldn't the wrongful act be, I mean, wouldn't the wrongful act be targeting your employer? I mean, look, if you said that, then I think we're done. But to me, you might have a vicarious liability claim on the tortious interference claim, but I don't see it on the defamation claim. Unless you can point us to something. No, I understand. And we'll rely on our briefs for the rest of that. If I can point to just one thing on the anti-SLAPP stuff, just briefly, I think what opposing counsel said was very important. She said, Mr. Talbot is who Mr. AINU targeted. Not a matter of public concern, a person. I think that says it all. Thank you. All right. I want to thank you both for your briefing and argument in a very interesting case. Excellent advocacy today. It's always good to see that in person. With that, we are adjourned for the day. We'll see everyone tomorrow. Thank you.
judges: GRABER, OWENS, NELSON